---

### THE EROS.

(District Court, E. D. New York. October 30, 1916.)

1. SHIPPING ⬮39—CHARTERS—CONSTRUCTION.
   A provision in a charter party that it shall be construed in accordance with the laws of a particular country does not limit the parties with respect to remedies, but simply supplies a particular rule of construction in case of dispute as to the meaning of its terms.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 141–148.]

2. CONTRACTS ⬮127(2)—SHIPPING ⬮34—CHARTERS—ARBITRATION CLAUSE.
   A provision of a charter party that any dispute thereunder shall be submitted to arbitration goes to the remedy only, and its effect is to be determined by the law of the forum. Under the law of the American admiralty courts, such a clause cannot deprive the parties of the right to appeal to the courts.
   [Ed. Note.—For other cases, see Contracts, Cent. Dig. § 611; Shipping, Cent. Dig. § 120.]

3. SHIPPING ⬮51—CHARTERS—BREACH.
   Claimant chartered his steam yacht in France by a time charter to libelant, to be delivered, with master and crew, for libelant's use at New York, where she arrived July 27, 1914. While minor repairs were being made, war was declared between France and Germany, and the master, under orders from claimant, refused to proceed on the ground that some of his crew were subject to mobilization for service in France. Such members were afterward discharged, and after some days of negotiations the master, under instructions from claimant, refused to fill the crew or move from the port, even within waters of the United States, and declared that "the whole thing is all off," whereupon libelant procured another yacht. The yacht was not requisitioned by the French government. Held that, under the facts, the action of claimant was not justified, and constituted a breach of the charter.
   [Ed. Note.—For other cases, see Shipping, Cent. Dig. §§ 203–210.]

---

⬮For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Admiralty. Suit by Eugene Higgins against the yacht Eros; Julien H. Evrard, master, claimant. Decree for libelant.

Duer, Strong & Whitehead, of New York City (Selden Bacon, of New York City, of counsel), for libelant.

Convers & Kirlin, of New York City (J. Parker Kirlin and Charles Stewart Davison, both of New York City, of counsel), for claimant.

VEEDER, District Judge. This is a libel for breach of a time charter of the yacht Eros to the libelant, Eugene Higgins, by the owner, Baron Henri de Rothschild, whose interests are asserted in the name of the master, Evrard, as claimant. The charter was entered into at Paris, May 12, 1914, between Baron de Rothschild, a French citizen, resident in Paris, the owner, and Eugene Higgins, an American, also residing in Paris. The yacht was of French register and flew the French flag. She was chartered to the libelant originally from July 20, 1914, to February 20, 1915, at a monthly rate of £1,428, a total of £9,996. The charter party provided that the yacht was to be delivered at Marseilles on July 20th, "and proceed at daylight that day for New York, so that the charterer may go on board at New York and get under way not later than noon on the 4th day of August, 1914." The charterer undertook "to pay all running expenses, consumable stores, including all such articles as coal, oil, waste, etc., harbor dues, and pilotage, and to feed the captain, stewards, and cooks." The owner undertook to maintain the yacht in full working order and repair during the whole period of hire, and also "to provide, pay, feed, and clothe a sufficient crew, consisting of, say, 39 men in all, including stewards, cooks, and wireless operator." Among other provisions were these:

"The captain shall have full control of the yacht, and shall be sole judge of the technical questions arising in connection therewith, as well as sole judge of the safety of the port in which he shall be asked to go or of the waters in which he shall be asked to navigate. But charterer, on the other hand, shall be entitled to the same attention as though he were the owner in respect of all matters other than those of a technical nature or than those concerning the safety of the yacht. Should the yacht be lost or damage occur not repairable within fifteen (15) days the charter price shall be abated from the time of such damage and from thenceforth this agreement shall cease."

The charter party expressly provided:

"This agreement to be construed according to English law."

And the instrument concluded with the provision:

"Should any dispute arise concerning this agreement same shall be referred to the arbitration of an arbiter mutually chosen or each party may appoint an arbiter and these two arbiters shall have liberty to appoint a referee, whose decision shall be final and binding on both parties."

By a supplemental agreement, set out in the libel, made May 22, 1914, the owner, in consideration of a payment of £340, undertook to have the yacht sail from Marseilles on the 10th of July, instead of the 20th, "so that she may arrive at New York and be properly prepared for the charterer to go on board when he arrives there by the steamship Vaterland on the morning of the 29th of July." The yacht sailed from Marseilles on the 10th of July, and, after some heavy weather, reached New

York on July 27th. There was, after leaving the Azores, some leaking of the boilers, which resulted in an exhaustion of the fresh water supply and some use of salt water. The ship was surveyed and repaired by August 1st. After steam was gotten up, on August 2d, there appeared again some leakage at additional points that had not been repaired; but this was not serious enough to prevent her from going with entire safety on voyages where she could secure additional supplies of fresh water every few days, and she was admittedly in satisfactory condition to go to Newport, R. I., where the charterer wished to spend some time. Arrangements were made for the yacht to leave for Newport with the charterer on board early on August 3d. Meanwhile, on July 28, 1914, Austria had declared war on Servia. On August 1st Germany had declared war on Russia, and German forces invaded Luxemburg. On August 2d German forces invaded Belgium. On August 3d France declared that a state of war with Germany existed. On Friday, July 31st, Capt. Evrard had cabled to Baron de Rothschild:

"Telegraph instructions in case of conflict. Consul says men of the reserve probable obliged to go back. Yacht should then be laid up or return to France. Charterer asks information."

The foundation for the last statement in this dispatch is given by Evrard in his testimony:

"He [Higgins] spoke to me a few words about the war; he asked me, 'What will happen in case of war?' And I told him I could not say exactly."

Later on he expressed doubt whether this suggestion was made by Mr. Higgins or by Mr. Whitehead, his business manager, and he finally says it was Mr. Whitehead. On August 2d Evrard received this answer from Baron de Rothschild:

"Place yacht in hands agent Watson. Keep stewards. Take instructions consul for return of men subject to mobilization."

Watson was the broker through whom the charter had been arranged. The log of the Eros for the following day, August 2d, contains this entry:

"The French consul advises of the order of mobilization. Stopped preparations for departure."

At this juncture Mr. Higgins, with his attorney, Mr. Stearns, and Mr. Whitehead, went aboard the yacht, and the captain was asked to explain his failure to comply with the charterer's orders. Capt. Evrard immediately produced Baron de Rothschild's cablegram, directing him to place the yacht in the hands of Watson's agent and to take instructions from the French consul concerning the men subject to mobilization, saying, as he handed it to Mr. Stearns:

"How can I? Look at this. I must take my instructions from my owners, not from Mr. Higgins."

After some discussion, however, and explanation that Mr. Higgins wanted simply to go to Newport and stay there three or four weeks, and that he would allow Evrard to keep constantly in touch by telephone with the French consul at New York, Evrard said he would take the yacht to Newport, but that under no circumstances would

he take her outside the three-mile limit. Captain Evrard then went to see the French consul, from whom, according to the log, he received on this day the following communication:

"In pursuance of the order of mobilization which we have just received, I ask you to place in my hands all the men who are by the conditions required to respond to that order. I ask you also to keep yourself in constant communication with the consulate general to be able to answer an immediate call."

The order of mobilization was not produced, but the captain characterized it in an entry in the log for that day as an order applying to men between 20 and 35 years, of whom there were 22 in the crew. On emerging from the consul's office, Evrard was requested by Stearns to cable Baron de Rothschild at once for authority to do anything that he was in doubt about. He said he did not need to, as he was master of the vessel and knew what he was supposed to do. He added:

"I will need perhaps two or three more men to go to Newport."

Evrard then raised some question about the extra cost of securing new men, whereupon Mr. Stearns suggested that the charterer would doubtless be willing to advance the difference, and that he (Stearns) would draw up an agreement to that effect. Evrard said, if that was done, he would go to Newport. Stearns that evening drafted and procured execution by Mr. Higgins of such an instrument, and telephoned Evrard that he had it and would bring it over the following (Tuesday) morning. Evrard said he was getting the crew together. Tuesday morning (August 4th) Stearns called on Evrard aboard the yacht and handed him the paper, signed by Higgins, undertaking to advance the extra wages for the crew. Evrard asked to look it over, and assured Stearns he was getting the crew, and that everything was all right. That evening the 22 men included in the first order of mobilization were discharged at the consulate, and sailed for France on the following day. On the latter date, according to the log, the captain received instructions from the consul to hold the men of the second reserve in readiness. But on the following day this order was suspended, pending verification, and was not renewed. On Wednesday morning, August 5th, on receipt of information that Capt. Evrard was again holding back, Mr. Stearns went aboard and inquired whether it was true that he refused to move the yacht as agreed. The captain replied:

"It is true. I cannot move the vessel without more definite instructions from Baron de Rothschild. My instructions now are to turn over the yacht to Watson."

Mr. Stearns then inquired whether he finally and definitely refused to move the yacht, and the captain replied that he did, adding, "The whole thing is off." Upon receiving a report of this interview Higgins cabled Rothschild as follows:

"As per your cable to him Captain Evrard absolutely refuses move Eros even within neutral waters or to engage crew to replace those returning France. Have offered every inducement as to financial help but he declares charter entirely canceled. Am therefore compelled to charter other yacht. As

·contract broken by you without any benefit of same to me, kindly return all moneys paid· to George Watson & Co., Glasgow, for my account, and cable me 'your intention as to this at once."

Baron de Rothschild admitted receiving this cable on August 5th. August 6th Rothschild cabled Watson & Co., of Glasgow, the ship brokers:

"Your telegram and cable received. Higgins alleges charter broken by my fault. Allegation unfounded, for crew under French law was obliged to return. Furthermore yacht subject to requisition by French navy department. As long as it is not requisitioned, I consent to continue the charter if Higgins on his own responsibility can engage at New York a French crew composed of men recognized by the consul general of France at New York as exempt from military obligation. The yacht must in no case leave the interior of the United States before end of war. If Higgins accepts, I will bear the additional expenses. crew. If Higgins refuses, can you take care of the yacht until it may be possible to send a French crew to bring it back. Kindly advise Higgins."

At the same time Rothschild cabled Higgins:

"Have given instructions Watson who will cable you what I can do to be agreeable to you under the circumstances."

August 7th Watson & Co. cabled to Higgins the substance of Rothschild's message to them. On August 8th Mr. Higgins cabled Rothschild:

"Advice received through Watson. Your offer as to French crew absolutely impossible of fulfillment. Repeatedly requested Evrard engage new crew, which he refused on your cabled instructions and also refused move Eros from New York under any circumstances. Contract therefore broken by you, but do not desire litigation over return of moneys paid if can avoid. Answer."

This message was received by Baron de Rothschild on August 11th. On Saturday, August 14th, after a delay of three days, he cabled Higgins:

"Have cabled instructions to Evrard to hold himself at your disposition with a French crew if possible."

On August 17th Higgins replied:

"Your acceptance of my proposition comes too late. As you know captain on your instructions refused carry out contract and I was obliged to charter other yacht. Furthermore, Evrard states cannot obtain crew."

. And on August 6th he followed this with a long letter (which was not received, however, until about August 25th) in explanation of the situation. When on the 5th of August Evrard peremptorily refused to move and declared the charter off, Mr. Higgins on the same day applied to Cox & Stevens to find another yacht for him. And on August 11th Mr. Higgins chartered the Cassandra, a slightly larger yacht, but the only similar vessel available. The captain and remainder of the crew (other than the 22 first called) were not mobilized, and remained on the yacht. The yacht was not turned over to Watson. The captain kept Higgins' flag flying until August 14th, when the flags, together with other property of the charterer remaining on board, were delivered to Higgins on his order. The captain kept up steam until August 10th. On the 12th the boilers were surveyed by a Lloyds' in-

spector; further repairs were proceeded with and completed by the end of the month. On August 14th Evrard received instructions by cable from Rothschild to hold himself subject to Higgins' order, and again early in September, after repairs had been completed, the yacht was once more tendered to Higgins. Meanwhile, however, on August 20th, Higgins had libeled the Eros in this court. Some two weeks after the libel was filed the owner sent a letter to Higgins notifying him that, the repairs (just referred to) having required more than 15 days to complete, the charter had ceased in accordance with its terms. In response to Higgins' libel, Rothschild, through Evrard, served notice that he declined to waive the provision of the charter for arbitration, and that he appointed as his arbiter James Gordon Bennett, a resident of Paris. Higgins was also requested to name his arbiter and to withdraw the present suit, but he refused. The yacht was subsequently released upon the substitution of the bond of August Belmont & Co., and returned to France with a foreign crew authorized by the French consul.

[1] It is contended by the claimant, at the outset, that inasmuch as the parties had specifically agreed that any dispute concerning their agreement should be referred to arbitration, and, to insure the enforcement of this provision, had further provided that English law should apply, the provision for arbitration should be enforced here, and that, pursuant to the English Arbitration Act of 1889 (52 & 53 Vict. c. 49), this action should be dismissed, or stayed until an arbitration has been held in accordance with English law and the dispute thereby adjusted, or until such arbitration has been found to be abortive. It is to be noted that the agreement is that the charter party shall be construed, not that it shall be enforced, according to English law. This provision does not attempt to limit the parties with respect to remedies, but simply supplies a particular rule of construction for the purpose of determining the meaning of clauses in a case where, owing to the various and uncertain localities of performance, different rules of interpretation of requirements might otherwise come into play.

[2] In any event, if such a general arbitration clause would ever apply to a repudiation of the agreement (Jureidini v. National British Millers' Insurance Co., [1915] A. C. 499), it is clear that it goes to the remedy, not to the rights, of the parties, and that its effect is to be determined by the law of the forum. And in this forum it is well settled that such a general arbitration clause is ineffective to deprive the parties of their right to appeal to the courts. United States Asphalt Co. v. Trinidad Lake Petroleum Co. (D. C.) 222 Fed. 1006, and cases there cited; Aktieselskabet Korn-Og Foderstof Kompagniet v. Rederiaktiebolaget Atlanten (D. C.) 232 Fed. 403; Meachem v. Jamestown R. R. Co., 211 N. Y. 346, 105 N. E. 653, Ann. Cas. 1915C, 851. It is therefore unnecessary to inquire whether, if the English Arbitration Act applied, the claimant has complied with its requirements.

[3] Although Baron de Rothschild's instructions of August 2d as to what should be done "in case of conflict" were perfectly explicit, and the conflict had ensued, Capt. Evrard did not comply at once. While he did, from that time on, follow the consul's instructions concerning the men subject to mobilization, he did not then, or subse-

quently, place the yacht in Watson's charge. Indeed, on the following day, August 3d, he consented to take the yacht to Newport. It seems quite likely that, if this provisional arrangement had been carried out, there would have been no controversy. For such a trip the captain needed only 2 or 3 new men in place of the 22 who had been called for by the consul, and with them the crew would still have met the requirements of French registry. The charterer agreed to advance the extra wages required; he desired to remain at Newport for some time, which would have afforded opportunity for consideration and possible adjustment. On the following day, according to the log, while preparations for departure were under way, the captain received instructions from the consul to hold the men of the second reserve in readiness; but this order was promptly countermanded, and was never in fact renewed. But on August 5th the captain changed his attitude. He refused to move the yacht, and declared that the whole thing was off. He stated in explanation of his attitude only that his "instructions now are to turn over the yacht to Watson." Thereupon Higgins sent the cable (which the Baron admits that he received on the same day) in which he summarized the situation with entire accuracy:

"As per your cable to him Captain Evrard absolutely refuses to move Eros even within neutral waters, or to engage crew to replace those returning France. Have offered every inducement as to financial help but he declares charter entirely canceled."

His concluding statement that the contract had been broken by Rothschild was a natural conclusion from the Baron's cable of August 2d as construed and acted upon by Capt. Evrard. If confirmation were needed of the owner's position, it was supplied by the subsequent cables of the 6th and 7th; for the Baron did not disaffirm either the captain's construction or his acts. In the instructions which he cabled Higgins that he had given to Watson as to what he does "to be agreeable to you under the circumstances," the Baron denied, not that the charter had been broken, but that it had been broken by his fault. The reasons specified by him were that the crew under French law was obliged to return, and that the yacht was subject to requisition by the French government. And then he proceeded to propose the substitution of a new and materially different contract, namely, that Higgins could use the yacht so long as it was not requisitioned, if, on his own responsibility, he could engage a crew composed of men recognized by the French consul general as exempt from military service, and would not leave the waters of the United States during the war. When on August 7th this proposal was communicated to Mr. Higgins, he promptly cabled his refusal to Baron de Rothschild on the following day, and on the 11th he chartered the Cassandra.

It is clear that Baron de Rothschild's attitude constituted a breach of the charter party by him, unless it was legally justified or excused under the circumstances. By its express terms the agreement was to be construed according to English law. Under that law, as under our own, the Baron de Rothschild's obligation to supply and maintain a crew, and to send the yacht wherever the charterer wished to go within the limits prescribed, was absolute. The outbreak of war

between France and other powers in no way relieved him of that obligation. It did not justify his refusal to permit the yacht to go outside the territorial waters of the United States, although performance may have been rendered more hazardous.

Even upon his own theory the claimant's defense fails. In his cable of August 6th Baron de Rothschild asserted, in effect, that the charter party had been broken by circumstances beyond his control, in that the crew under French law was obliged to return, and the yacht was subject to requisition by the French navy department. As formulated in legal phraseology at the hearing, the contention was that the claimant was relieved by force majeure under the French Code; but there was no proof that the yacht was subject to requisition, and it was not requisitioned. With respect to the asserted obligation of the crew to return to France, I have already referred to the fact that no order of mobilization is in evidence. But the French law concerning mobilization, which is in evidence, provides that sailors included in a call who are in course of a voyage at the time are not required to obey it until "the morrow after the return of their ship into a port of France." Law of June 24, 1880, § 4.

Moreover, the provision of the decree of 1793 that "no ship will be reputed French, nor shall have the right to the privileges attached to French ships, if the officers and three-quarters of the crew are not French," is not in terms a positive prohibition. According to the Pandectes Françaises (sections 471–473) this requirement has long been theoretical only; and as late as 1885 the Minister of Marine authorized a form of permit that could be issued by consular authorities, requiring only the annual issue of a permit of navigation, a French captain, and two-thirds of the capital invested to belong to Frenchmen. There is in evidence only Capt. Evrard's casual statement that the French consul refused him permission to ship a mixed crew. But later on the consul authorized him to return to France with a foreign crew, and there is nothing in the evidence which indicates to my mind that the Baron de Rothschild could not have obtained a permit to ship a mixed crew.

At the oral argument it was contended that the charter had terminated automatically in accordance with its terms, because the vessel's boilers had been so strained on the voyage from Marseilles to New York that the damage was "not reparable within 15 days." In view of the fact that it is admitted by counsel for the claimant in their brief that the necessity for such repairs is relevant only with respect to the good faith of the owner, it is unnecessary to refer to the matter further than to point out that the acts of the owner and captain during the first week in August, upon which the libelant relies to establish a breach of the charter, have no relation to any such condition. This suggestion was made for the first time more than a month after the alleged breach complained of, and some two weeks after the libel had been filed. The damage sustained by the yacht was concededly not such as disabled her in any way from proceeding to Newport, and the evidence does not show that the damage could not have been repaired within 15 days.

The measure of the libelant's damage is the extra expense of the Cassandra in place of the Eros for the remainder of the charter period, together with the incidental expenses involved in the transfer from one to the other. This involves readjustment of the prepayment of the charter hire of the Eros. The libelant is chargeable only with hire to August 5, 1914, at the prescribed charter rate per month.

A decree for libelant in accordance herewith may be settled upon notice.